# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Rodney Jerome Furtick, Appellant.

Appellate Case No. 2019-001920

———————

Appeal From Lexington County
Frank R. Addy, Jr., Circuit Court Judge

———————

Opinion No. 6032
Heard December 6, 2022 – Filed November 8, 2023

———————

## AFFIRMED

———————

Appellate Defender Joanna Katherine Delany, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Joshua Abraham Edwards, both of
Columbia, and Solicitor Samuel R. Hubbard, III, of
Lexington, all for Respondent.

———————

**MCDONALD, J.:** Rodney Furtick appeals his second-degree criminal sexual conduct (CSC) conviction and sentence, arguing the circuit court erred in finding certain prior convictions admissible under Rule 609, SCRE. Furtick contends the circuit court applied an improper balancing test and eliminated any probative value the prior convictions may have once had by "sanitizing" them. Essentially, Furtick's position is that if the convictions needed sanitizing, the circuit court

should have excluded them entirely.  We disagree, and we affirm the circuit court's well-reasoned analysis.

**Facts and Procedural History**

In August 2015, J.H. (Victim), her then-husband (Husband), and their one-year-old daughter moved to Cayce.  The couple did not own a vehicle, and they shared a cell phone.  Husband generally worked a night shift and walked to work.

In October 2015, Husband befriended Furtick, who could often be seen walking around the neighborhood.  Victim testified at Furtick's trial that she told Husband she did not want Furtick around when Husband was not present because Furtick made her uncomfortable.  By that time, Furtick was visiting the couple's home once or twice a week.

At some point that same October, Victim reported to the police that Furtick or his girlfriend had stolen her Electronic Benefits Transfer (EBT) card; however, at the time of Furtick's trial, Victim did not recall making this report.  She explained, "I probably did, but I was basically a single mother.  My husband didn't do anything for my daughter.  I was more focused on my daughter than anything else."[1]

On November 18, 2015, Husband left the house shortly before dark to visit a hobby shop.  Victim recounted that while she was getting Daughter ready for bed, she heard a knock at the back door and saw the door begin to open as she approached it.  Although she tried to push the door closed, Furtick entered the home uninvited, and Victim asked him to leave.  At that point, Victim instructed Daughter to go lie down in her bed, but Daughter instead moved in front of Victim.  Furtick put down a plate of food he was carrying, walked toward Victim, and pushed Daughter into a corner, causing a red mark on Daughter's back.  When Daughter began to cry, Victim carried her to Victim's bedroom and instructed her to cuddle with the pillows there.  Furtick then pushed Victim backwards into Daughter's room and ordered her to lie down.  During all of this, Victim was scared for Daughter because Daughter "started crying and screaming."  While backing into the bedroom, Victim tripped over Daughter's toys and Furtick shoved her to the floor.  He then began trying to kiss her and attempted to remove her tights at the feet but became frustrated and yanked the tights down from Victim's waist.  Furtick then raped Victim while Victim stared at Daughter in an effort to try to

---

[1] Victim and Husband have since divorced.

keep her from approaching.  Following the sexual assault, Furtick cleaned himself with baby wipes.

When asked why she did not try "to fight him off," Victim explained she was afraid Furtick would hurt Daughter.  Victim testified Furtick became annoyed because Daughter continued to cry and try to enter the room.  At times, Furtick "kept turning to glare" at Daughter.  Then, as he was leaving, Furtick told Victim that if she told anyone about what happened, "he would tell his friends that [her] house was free game."

After Furtick left, Victim grabbed Daughter and ran across the street to a neighbor's house.  She told the neighbor she had been raped, and the neighbor called 911.  Neighbor testified Victim was very upset and visibly shaking.

Shortly after receiving the dispatch, Sergeant John Robert Reese of the Cayce Department of Public Safety (CDPS) responded to the scene.  Sergeant Reese testified Victim was very upset, her clothing was disheveled, and she identified her attacker as "a black male and the name was Rodney or Todd."[2]

Paramedic Marilyn Sanchez treated Victim at the scene and observed she was "very anxious, nervous, paranoid, looking around like she was looking for someone or something."  Victim was then transported to Prisma Health Richland, where a forensic nurse examiner completed a sexual assault evidence collection kit.  Lieutenant Jason Merrill responded to the hospital and interviewed Victim; he then gave her a ride home.  In his search of the home, Lieutenant Merrill collected crumpled baby wipes and black tights from the floor of Daughter's room.

On December 10, Lieutenant Merrill and Sergeant Caleb Thomas questioned Furtick at CDPS headquarters.  Lieutenant Merrill informed Furtick that CDPS was investigating a November 18 criminal incident at Victim's home.  When Lieutenant Merrill asked Furtick if there was any reason his DNA might be found there, Furtick denied ever being inside the house.  He further denied that he knew Husband or Victim, even after being shown a photograph of Victim bearing her name.

On December 30, CDPS transported evidence from the scene and Victim's sexual assault kit to the South Carolina Law Enforcement Division (SLED), where it was

---

[2] Victim provided Sergeant Reese with a description and a first name but did not know Furtick's last name.

tested for semen and saliva. Vaginal and rectal swabs from the kit tested positive for the presence of semen; the swabs from Victim's arm, breasts, and cheeks were positive for saliva. Cuttings from Victim's underwear were also positive for components of semen. SLED forensic scientist Samuel Stewart later developed a DNA profile.

CDPS then obtained a search warrant and collected Furtick's DNA, which matched the semen on the vaginal and rectal swabs. Stewart testified the probability of an unrelated individual matching the semen on these items was one in seventeen quintillion. He further noted Furtick was a minor contributor to some of the DNA found on other tested items.

A Lexington County grand jury indicted Furtick for first-degree CSC and first-degree burglary. At Furtick's subsequent trial, the State notified the circuit court that if Furtick testified, it intended to introduce evidence of his prior convictions: a 2010 conviction for burglary, a 2012 petit larceny conviction, two 2012 second-degree assault and battery convictions, and a 2015 conviction for a third-offense property crime.

The circuit court noted the petit larceny and property offense were crimes involving dishonesty, and Furtick requested that the court reference larceny only, not "a third or subsequent offense," because this was a petit larceny with a sentencing enhancement. The State consented to this request.

Furtick further argued that under Rule 609(a), SCRE, his convictions for burglary and assault and battery should be excluded due to their similarities to the crimes for which he was currently being tried. Furtick asserted that under Rule 403, the probative value of these prior convictions would be substantially outweighed by their prejudicial effect because the case "boils down to a swearing contest." The State countered that burglary was a crime of dishonesty and Furtick had frequently attacked Victim's credibility. The circuit court noted burglary was not a crime of dishonesty under *State v. Bryant*[3] and the burglary conviction was indeed similar to one of the crimes for which Furtick was on trial. Thus, the court's "initial impression [was] to decline to allow the State to go into or specifically say a burglary."

---

[3] 369 S.C. 511, 517–18, 633 S.E.2d 152, 155–56 (2006).

The circuit court noted the assault and battery convictions were likely admissible because their similarities to the CSC count were insufficient to warrant exclusion. Still, the circuit court explained that after an evening review of the *State v. Colf*[4] factors and recent caselaw, the court would revisit the admissibility of these convictions the following day before trial resumed.

Upon reconvening the next morning, the circuit court explained:

> I have some further reflection on how to treat the assault charges or the assault convictions and after reviewing the caselaw, the Court has to conclude in order to allow those specific convictions to come in as assault and battery seconds that legally the Court would have to conclude that the probative value of that impeachment substantially outweighs any undue prejudice.
>
> And I've looked at the five factors, I've considered it. Doing a 403 balancing analysis, I think that the impeachment value mostly outweighs the danger of unfair prejudice but I cannot say it substantially outweighs the danger of unfair prejudice and the key to this—or the key to my reasoning is that by allowing the jury to hear that he was convicted of assault and battery second degree is tantamount to basically suggesting to the jury that the Defendant has a propensity towards violence, a propensity to assault people, and, of course, sexual assault is one of the charges he's facing.

The circuit court instructed the State to limit its questions relating to the assault and battery and burglary convictions to reflect Furtick was convicted of "two misdemeanors in 2012 and a felony in 2010 that carried a possible punishment of more than one year in prison."

Furtick's counsel responded,

> [O]ur position would be that if the rules don't allow it, if you can't fit a square box into a round hole, then why should we sand off the corners of the square box and now

---

[4] 337 S.C. 622, 627, 525 S.E.2d 246, 248 (2000).

push it through the hole?  I didn't see anything where that was addressed in any of the caselaw and so our position would be if the rules don't allow it, then it just shouldn't come in, it shouldn't be, quote unquote, sanitized.

Furtick's counsel further noted, "I can't find any cases that talk about this whole hey, sanitizing it is okay, but I've seen it in this circuit and I've seen it in some other circuits, I've just not seen it challenged."

The circuit court replied,

[M]y opinion is that the prejudice flows from the similar nature of the crime, so calling something a burglary when you're on trial for burglary or calling something a rape when you're on trial for rape is what creates the prejudice if they have that prior conviction for that similar type of offense and the prejudice is substantially lessened if you're simply allowed to inquire as to a nameless felony or a nameless misdemeanor, and so that's—that's the reasoning that this Court is employing it and I think other judges [have] employed routinely.

Furtick testified he met Husband in October 2015 when he saw him in his yard smoking a cigarette.  He and Husband talked all afternoon, walked to a store, and Husband eventually invited Furtick into his home.  Later, when Husband left for work, Furtick stayed and socialized with Victim.  He claimed the two "became fond of one another" and had consensual sex that afternoon.  Furtick further claimed Victim and Husband were friendly toward him when they saw him after this encounter.  Although Furtick admitted he had Victim's EBT card at one point, he said Husband gave him the card and pin number and agreed for Furtick to sell it "and get them a few dollars."

Furtick admitted he was present at Victim's home on November 18, 2015.  He testified he had agreed to help Victim sell some baby food that she no longer needed, but he returned the food to her when he was unable to sell it.  Furtick denied Victim ever asked him to leave; he claimed he and Victim talked for a while, he asked her if she wanted to have sex, and she said yes.[5]  He then remained at the house for another five to ten minutes.  On cross-examination, the State

_____

[5] During her testimony, Victim denied the two ever had consensual sex.

brought out inconsistencies between Furtick's testimony at a pretrial hearing and his trial testimony, such as the location of the first alleged sexual encounter and what Victim was wearing.

Furtick's trial testimony also contradicted his statements to law enforcement during the investigation—the most notable contradiction was Furtick's trial admission that he knew Husband and Victim and began regularly interacting with them in October 2015. Furtick claimed that when law enforcement asked him if he knew Victim or Husband, he did not deny that he knew them but told the officers he could not see the pictures. He maintained he did not admit he knew Victim—despite being asked if he knew her by name—because he could not see her photo. He provided the same explanation as to Husband's photo and his initial denial. When asked why he did not identify the couple after the officers obtained a pair of glasses for him, Furtick claimed he ended the interview because the officers would not let him keep the glasses.

Furtick was convicted of the lesser included offense of second-degree CSC but acquitted of burglary. The circuit court sentenced him to twenty years' imprisonment.

## Standard of Review

"In criminal cases, appellate courts sit to review errors of law only." *State v. Robinson*, 426 S.C. 579, 591, 828 S.E.2d 203, 209 (2019). "The admission of evidence concerning past convictions for impeachment purposes remains within the trial [court's] discretion, provided the [trial court] conducts the analysis mandated by the evidence rules and case law." *Id.* (alteration by court) (quoting *State v. Dunlap*, 346 S.C. 312, 324, 550 S.E.2d 889, 896 (Ct. App. 2001)).

## Law and Analysis

Furtick argues the circuit court erred in allowing the State to impeach him with sanitized convictions otherwise inadmissible under Rule 609(a)(1) and the *Colf* factors. He contends this error was not harmless because his defense hinged on the credibility of his testimony that any sexual encounter with Victim was consensual.

Rule 609(a), SCRE, provides:

For the purpose of attacking the credibility of a witness,

(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and

(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

For the purposes of this rule, a conviction includes a conviction resulting from a trial or any type of plea, including a plea of nolo contendere or a plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970).

In *Colf*, our supreme court delineated the following factors a circuit court must consider in a Rule 609 analysis when weighing the probative value of prior convictions against their prejudicial effect:

1. The impeachment value of the prior crime.
2. The point in time of the conviction and the witness's subsequent history.
3. The similarity between the past crime and the charged crime.
4. The importance of the defendant's testimony.
5. The centrality of the credibility issue.

337 S.C. at 627, 525 S.E.2d at 248.

Our supreme court provided further guidance in *Robinson*,[6] explaining:

---

[6] In *Robinson*, the circuit court admitted into evidence several prior convictions, including a burglary conviction the circuit court ruled "had to be referred to generically as a 'prior felony conviction carrying more than one year in prison.'"

Rule 609(a) invokes three impeachment scenarios. First, under Rule 609(a)(1), evidence that a witness other than an accused has been convicted of a crime punishable by death or imprisonment for more than one year (in the jurisdiction where the conviction occurred) is admissible, subject to Rule 403, SCRE. Under Rule 403, evidence of such a conviction "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The Rule 403 test places the burden upon the opponent of the evidence to establish inadmissibility pursuant to Rule 403. Second, under Rule 609(a)(1), when the accused chooses to testify during his trial, if the State seeks to introduce impeachment evidence that the accused has been convicted of a crime punishable by imprisonment for more than one year, the evidence is admissible if the State establishes the probative value of admitting the evidence outweighs its prejudicial effect upon the accused. Third, under Rule 609(a)(2), if a witness, even an accused, has been convicted of a crime involving dishonesty or false statement, evidence of such a conviction shall be admitted regardless of the maximum punishment and regardless of the probative value or prejudicial effect of the evidence.

. . . .

Rule 609(a)(2) requires no balancing test for admissibility of a prior conviction for a crime involving dishonesty or false statement. However, Rule 609(a)(1) and Rule 609(b) require the trial court to balance—in three varying degrees—the probative value of evidence of a prior conviction and the degree of prejudice to the opponent of the evidence (as noted, the Rule 403 test also

426 S.C. at 588, 828 S.E.2d at 207. The supreme court noted the admission of this conviction for the purpose of impeachment was not appealed. *Id.*

requires the trial court to consider confusion of the
issues, misleading the jury, etc.). Even though these
three Rule 609 admissibility tests differ from one
another, we have, through *State v. Colf*, provided a
uniform set of factors for the trial court to consider when
applying each test.

426 S.C. at 593–94, 828 S.E.2d at 210.

"The starting point in the analysis is the degree to which the prior convictions have
probative value, meaning the tendency to prove the issue at hand—the witness's
propensity for truthfulness, or credibility." *Id.* at 597, 828 S.E.2d at 212 (quoting
*State v. Black*, 400 S.C. 10, 21, 732 S.E.2d 880, 886 (2012)). "The tendency to
impact credibility . . . determines the impeachment value of the prior conviction.
Impeachment value refers to how strongly the nature of the conviction bears on the
veracity, or credibility, of the witness." *Id.* at 598, 828 S.E.2d at 212–13 (quoting
*Black*, 400 S.C. at 21–22, 732 S.E.2d at 887) (omission by court). "Although prior
convictions for robbery, burglary, theft, and drug possession are not crimes of
dishonesty or false statement, which would result in automatic admissibility under
Rule 609(a)(2), such convictions may still have impeachment value under Rule
609(a)(1)." *Id.* at 599, 828 S.E.2d at 213.

"[U]nder Rule 609(a)(1), if the witness is the accused and has a prior conviction of
a crime punishable by death or imprisonment for more than one year, the trial court
must balance the *Colf* factors and determine whether the probative value of the
conviction outweighs its prejudicial effect to the accused." *Id.* at 595, 828 S.E.2d
at 211. "An on-the-record balancing test is particularly important for prior similar
convictions under Rule 609(a)(1) because the 'similarity of a prior crime to the
crime charged heightens'" its prejudicial nature. *State v. Howard*, 384 S.C. 212,
221, 682 S.E.2d 42, 47 (Ct. App. 2009) (quoting *State v. Elmore*, 368 S.C. 230,
239, 628 S.E.2d 271, 275 (Ct. App. 2006)).

Relying on *United States v. Boyce*, 611 F.2d 530, 530 (4th Cir. 1979), our appellate
courts have seemingly approved the sanitization of prior convictions in cases
addressing Rule 609. In *Boyce*, a defendant convicted of defrauding a federally
insured bank appealed his conviction in part because the prosecutor asked on
cross-examination whether he had been convicted of a felony and inquired as to the
nature and number of such convictions. *Id.* at 530. The Fourth Circuit noted Rule

609(a), FRE,[7] allows a defendant to be impeached by proof of his prior felony convictions; a defendant may be asked matters including the name of the crime, the time and place of the conviction, and the punishment. *Id.* The Fourth Circuit found "[i]t follows that there was no plain error in permitting the United States Attorney to inquire about the number and nature of defendant's felony convictions, particularly since the defendant himself had already testified that he had been convicted of a felony and there was no objection at trial." *Id.* at 530–31. The court stated in a footnote, "In the special case, where the prior conviction is for the same offense as that for which the defendant is being tried, the trial court generally will not permit the Government to prove the nature of the offense on the ground that to do so would amount to unfair prejudice." *Id.* at 530, n.1.

In *Green v. State,* our supreme court referenced the *Boyce* footnote, stating, "One tactic the Fourth Circuit Court of Appeals employs is to allow the prosecutor to ask

---

[7] Rule 609(a), FRE states:

> The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:
>
> (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:
>
> (A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and
>
> (B) must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and
>
> (2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving — or the witness's admitting — a dishonest act or false statement.

the defendant about the existence of prior convictions, but not their nature." 338 S.C. 428, 433 n. 5, 527 S.E.2d 98, 101 n.5 (2000). The *Green* court also explained:

> Federal courts have held that prior convictions for the same or similar crimes are highly prejudicial and should be admitted sparingly. While some federal circuits have held such convictions admissible if, after consideration of other factors, their probative value outweighs their prejudicial effect, the Fourth Circuit has been one of the stricter circuits, refusing to permit impeachment with similar prior convictions. We decline to hold similar prior convictions inadmissible in all cases. Trial courts must weigh the probative value of the prior convictions against their prejudicial effect to the accused and determine, in their discretion, whether to admit the evidence.

*Id.* at 433, 527 S.E.2d at 100–01 (internal citations omitted) (footnote omitted).

Two years later, in *State v. Rollins*, this court found the circuit court did not abuse its discretion in admitting evidence of a defendant's prior convictions because:

> In this case, the trial judge reviewed Rollins' history of convictions and adopted the tactic mentioned in the *Green* footnote. In addition to limiting the amount of detail about the prior convictions, the trial judge instructed the jury that the prior convictions could only be considered in determining Rollins' credibility. This procedure minimized the prejudice to Rollins.

348 S.C. 649, 653, 560 S.E.2d 450, 452 (Ct. App. 2002).

The court of appeals again referenced this approach in its 2006 *Elmore* opinion, explaining:

> One permissible approach, advocated by the United States Fourth Circuit Court of Appeals, is to allow the prosecutor to ask the witness about the existence of a prior similar conviction under Rule 609(a)(1) without

disclosing to the jury the nature of the prior offense. *See Boyce*, 611 F.2d at 531 n. 1. The *Boyce* approach was approvingly referenced by our supreme court in *Green*, 338 S.C. at 433 n. 5, 527 S.E.2d at 101 n. 5. The *Boyce* approach still requires a meaningful balancing of the probative value and prejudicial effect before admission of the prior conviction, although the prejudice occasioned by the similarity of the prior crime to the crime charged is removed.

368 S.C. at 239 n.5, 628 S.E.2d at 276 n.5.

In Furtick's case, we acknowledge the circuit court used a different balancing test when it stated, "Doing a 403 balancing analysis, I think that the impeachment value mostly outweighs the danger of unfair prejudice but I cannot say it substantially outweighs the danger of unfair prejudice." Under Rule 609(a)(1), the Rule 403 balancing test is used in determining the admissibility of prior crimes of a witness other than the accused. When determining whether an accused's prior convictions may be admitted under Rule 609(a)(1), evidence of a defendant's prior convictions carrying more than one year of imprisonment "shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Thus, it appears the circuit court's use of a balancing test requiring the impeachment value to *substantially* outweigh the danger of unfair prejudice actually inured to Furtick's benefit.

The circuit court also indicated it considered the *Colf* factors, though it did not specifically reference each factor. Still, the court clearly considered the similarities of the various crimes and the centrality of the credibility issue at trial. The record demonstrates the circuit court weighed the prejudicial effect of admitting the convictions, finding any prejudice was due to the similarity of the convictions to Furtick's current charges. The circuit court then sought to mitigate this prejudice through sanitization—barring any reference to the specific similar crimes for which Furtick had been previously convicted. In requiring sanitization, the court referenced the dates of Furtick's various prior convictions; the oldest admitted conviction occurred five years before Victim's sexual assault. Considering the impact of the prior convictions on credibility, the circuit court explained credibility was "quite important in this case" and thus declined to allow the State to introduce the nature of the convictions. We find the circuit court's sanitization approach was appropriate and that its analysis satisfied the requirement of a meaningful on-the-record balancing of the *Colf* factors.

Moreover, even if the circuit court erred in sanitizing or discussing its balancing of Furtick's prior convictions, such error would be harmless. When the circuit court admitted Furtick's two larceny convictions, Furtick's only request was that one of the convictions be called "larceny" with no "subsequent offense" or enhancement reference. Because evidence of two convictions for crimes of dishonesty had been admitted, the prejudicial effect of admitting other convictions referenced only as "two misdemeanors in 2012 and a felony in 2010 that carried a possible punishment of more than one year in prison" was low. *See Black* 400 S.C. at 27–28, 732 S.E.2d at 890 (finding erroneous admission of a witness's remote manslaughter conviction harmless due to the unchallenged admission of another prior conviction for shooting/throwing a deadly missile). Of further significance is the fact that when law enforcement initially questioned Furtick, he denied that he knew Victim or Husband. Furtick alleged a consensual sexual relationship with Victim only after SLED's analysis revealed his DNA was a match for the DNA recovered from her sexual assault examination kit. For these reasons—and due to the other evidence detailed above, such as Furtick's odd claims about the reading glasses and not recognizing Victim or Husband in their photos—this was far from a "he said, she said" case. *See State v. Phillips*, 430 S.C. 319, 342, 844 S.E.2d 651, 663 (2020) ("As part of our harmless error analysis, we review 'the materiality and prejudicial character of the error' in the context of the entire trial."); *State v. Stukes*, 416 S.C. 493, 501, 787 S.E.2d 480, 484 (2016) (Kittredge, J., dissenting) (in which the dissent noted it would find harmless the erroneous jury charge because "[i]n addition to the evidence corroborating the victim's testimony, the jury was presented with Stukes's inconsistent statements. Stukes initially denied knowing the victim, much less having had sex with her. When pressed with the evidence, including the DNA match, Stukes remembered the victim and that they had consensual sex.").[8]

For these reasons, Furtick's conviction and sentence are

**AFFIRMED.**

**GEATHERS, J. and HILL, A.J., concur.**

---

[8] We note that despite the admission of the sanitized convictions, the jury acquitted Furtick of the first-degree burglary charge and convicted him of the lesser included offense of second-degree CSC, not the first-degree CSC for which he was indicted.